**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

\* \* \*

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| Plaintiff, ) | 2:09-cr-00223-RCJ-LRL |
| v. ) | |
| RONALD DAIN HARRIS, ) | MOTION TO SUPPRESS STATEMENTS FOR FIFTH AMENDMENT VIOLATION (#24) |
| Defendant. ) | |

# REPORT & RECOMMENDATION

The defendant, Ronald Dain Harris, is under indictment on a charge of Felon in Possession of a Firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). The matter before the court is Harris's Motion to Suppress Statements for Fifth Amendment Violation (#24), in which he contends that he was interrogated without *Miranda* warnings despite heavy drug use which left him incapacitated and unable to voluntarily waive his Fifth Amendment rights. Also under submission are the government's Opposition (#25), defendant's Reply (#26), defendant's Supplement to Defendant's Motion to Suppress (#30), defendant's Response to Court Order (#33), the government's Reply to Defendant's Response to Order to Produce Transcript (#34), and defendant's Rejoinder to Government's Reply to Order to Court Order [Sic] (#36). An evidentiary hearing was held on the motion on December 23, 2009. Having considered the papers submitted in this matter and the testimony offered at the evidentiary hearing, the court submits this Report and Recommendation.

**THE EVIDENCE**

Based on the testimony adduced at the evidentiary hearing and the exhibits attached to the parties' papers, the court finds the following facts have been established by a preponderance of the

evidence. On June 25, 2008, shortly after 6:30 a.m., a casino security officer, Christopher Motes, found Harris passed out in the driver's seat of a vehicle with the engine running in the valet area of the Excalibur Hotel and Casino.  Motes awakened Harris who seemed fidgety and possibly under the influence of a controlled substance.  After having Harris exit the vehicle, Motes observed a firearm on the driver's side floorboard.  Harris was escorted to the Excalibur's security office, where security officers recovered a meth pipe from his pocket. Hotel security called the Las Vegas Metropolitan Police Department ("Metro"), which dispatched Officers Laythorpe and Dredla to the security office at approximately 7:20 a.m.

A surveillance camera recorded the events which occurred in the security office from 6:32 a.m. thru 7:34 a.m. The recording was admitted as evidence in this case. The first eight minutes of the video depict Harris interacting with Motes, and two other casino security officers.  In response to the officers' questions, Harris stated his name was "Ronald Harris"; represented that the gun from the floorboard of the car belonged to the person whose car he was found in; stated that the car belonged to a friend's uncle; gave his date of birth accurately; stated his social security number; provided his address; and stated that he had recently been released from prison, where he had been imprisoned on a drug trafficking charge. Harris willingly followed instructions – sitting when told to sit and standing when told to stand.  When asked how he could prove his identity due to his lack of identification, Harris stated that he "can tell you who I um, I can tell you what information I would know about Ronald Harris ... my mother's maiden name, I can tell you how my signature card I got at US Bank."

After this round of questions, Harris was instructed to sit, which he did, and promptly fell asleep. At approximately 7:02 a.m., a Metro officer attempted to rouse Harris by patting him on the leg and speaking to him for nearly 20 seconds.  Harris was unresponsive, and the officer let him be.  At approximately 7:25 a.m., Metro Officers Dredla and Laythorpe arrived at the casino security office. After processing paperwork and speaking with casino security officers, Laythorpe approached Harris at about 7:35 a.m. Laythorpe loosened Harris's handcuffs at Harris's request, while Dredla asked Harris his name.  Unable to elicit an intelligible response, Dredla instructed Harris to stand up, which he did.

She then patted Harris down as he leaned his head forward against the wall.

After turning Harris back around, Dredla told him to put his shoe on; Harris put his shoe on. She told Harris to sit down; Harris sat down. Dredla again asked for Harris's name, to which he responded, "Ron." Laythorpe inquired if Harris had "been drinking today," to which Harris shook his head, "no." Laythorpe asked whether Harris had used drugs that day, but received no response. Dredla told Harris to look up, which he did, and she placed her hand on his forehead. Laythorpe continued to inquire what drugs Harris was on, and Harris mumbled something in return. When asked how long he'd been on the drugs, Harris stated, "today." Dredla asked if Harris had any medical conditions or was on any medicine, and Harris shook his head, "no." Laythorpe then helped Harris up from the bench on which he was seated, and told Harris they "are gonna go for a walk." Harris walked out on his own with Laythorpe. All of the foregoing was captured on the video recording that was played during the hearing.

Outside the security office and off camera, according to the testimony of Officer Laythorpe, Harris walked ahead of him without assistance to the police cruiser, which was located approximately 60-100 yards from the security office. After placing Harris in the back seat of the car, Laythorpe read Harris his *Miranda* rights. Laythorpe asked Harris if he understood his rights, to which Harris responded yes. Harris then allegedly admitted to buying the gun which was found in the car from somebody in Los Angeles, but he didn't say how much he had paid for it. Laythorpe drove Harris to the police station. The drive was approximately 15-20 minutes. Upon arrival at the station, Laythorpe attempted to administer a field sobriety test, but was unable to due to Harris's inability or unwillingness to take the test. Laythorpe read Harris an Implied Consent to Draw Blood. When asked if he understood, Harris first nodded and mumbled, then said, "yes."

**DISCUSSION**

The Fifth Amendment requires suppression of statements made during a custodial interrogation unless the defendant has been apprized of, and validly waives, his rights to silence and/or the presence of an attorney under *Miranda v. Arizona*, 384 U.S. 436 (1966). For a waiver to be effective, it must be made knowingly and voluntarily. *Colorado v. Connelly*, 479 U.S. 157, 168-69 (1986). A confession

made in a drug or alcohol induced state, or even while when in the hospital, on medication, and in pain, may be deemed voluntary if it remains the product of a rational intellect and a free will. *See United States v. Banks*, 282 F.3d 699, 706 (9th Cir. 2002) *rev'd on other grounds* 540 U.S. 31 (2003) (holding statements voluntary though defendant was under the influence of narcotics and alcohol where he "was able to understand the circumstances, follow instructions, and answer questions"); *United States v. George*, 987 F.2d 1428, 1430-31 (9th Cir. 1993) (citations omitted) (holding statements voluntary even though defendant was in the hospital suffering from "an apparent drug overdose" inasmuch as his injuries "did not render him unconscious or comatose"); *United States v. Martin*, 781 F.2d 671 (holding statements voluntary though defendant was under the influence of Demerol and in pain at the time of interrogation). The government bears the burden of establishing voluntariness by a preponderance of the evidence. *Lego v. Twomey*, 404 U.S. 477, 489 (1972).

This is a close case. The scene depicted in the surveillance video surely indicates that Harris was under the influence while in the security office, and was asleep much of the time. In contrast, however, Laythorpe testified that Harris was awake and cognizant when he administered the *Miranda* warnings. Harris urges the court to extrapolate from the scene depicted in the security office and find that because he slept much of the time, drooling on himself, he could not have made a meaningful, knowing and intelligent waiver during the portions of time in which he was not sleeping and drooling – almost as if Harris had been "sleep-talking." Obviously, however, the test is not the reactivity of a suspect *while he is sleeping or otherwise unconscious*. The test is whether the suspect, *while awake*, "was coherent, gave responsive answers to questions, and was able to remember accurately [details]." *George*, 987 F.2d at 1431 (relating to the specific issue of voluntariness while a defendant is known to be under the influence ).

Notably, Harris was actively communicative with security personnel when initially questioned in the security office. Not only was he able to recall his identity, birthday, address, social security number, prior criminal record including his date of release from prison; he was also able to *reason* through how he might prove his identity given that he had no identification on him, thinking of

4

providing his mother's maiden name and his US Bank signature card. It is true that this exchange took place roughly an hour before the advisement of the *Miranda* rights by Officer Laythorpe, and Harris fell fast asleep shortly thereafter. It is also plain that Harris slept through conversation and jokes at his expense, as well as discussions of other security business in the office, and that he came to only when awakened by officers. It is equally plain, however, that Harris did *wake up* during the hour he was in the security office and was responsive to the officers during the final minutes of the surveillance video, moments before Laythorpe administered the *Miranda* warnings.

The court might view the case and Officer Laythorpe's testimony differently had Harris been non-responsive in the final minutes of the video, needing, for example, to be propped up by officers to make it to the police cruiser, half-shuffling, half-being dragged to the door with his head lolling, reminiscent of a scene from One Flew Over the Cuckoo's Nest. But that's not what happened. Harris stood when he was told to stand; took off his shoe and replaced it when he was told to do so; walked out of the security office unaided; and walked approximately 60-100 yards to the police cruiser without assistance. Officer Laythorpe's uncontroverted testimony is that when he administered *Miranda* warnings to Harris, Harris was awake, his eyes were open, and he "appeared cognizant." When asked whether he understood his rights, Harris nodded, then said "yes." He then made admissions regarding the gun that was found in his car. This is all that is required under *George* – that Harris was conscious and could answer in the affirmative whether he understood his rights and then accurately answer questions. 987 F.2d at 1431. Even fifteen to twenty minutes later, Harris was coherent and acknowledged that he understood when Laythorpe read him the law on Implied Consent to Draw Blood. Finally, not insignificant to Harris's waiver is that as a convicted felon Harris was neither naive nor ignorant regarding the criminal justice system. *See United States v. Williams*, 291 F.3d 1180, 1190 (9th Cir. 2002) *rev'd on other grounds United States v. Gonzalez*, 506 F.3d 940, 942 (9th Cir. 2007) (familiarity with the justice system is one factor which may support a finding of voluntariness). Thus, the court finds that the record demonstrates by a preponderance of the evidence that Harris's waiver of his *Miranda* rights was made voluntarily.

5

**RECOMMENDATION**

Based on the foregoing, it is the recommendation of the undersigned United States Magistrate Judge that Harris's Motion to Suppress Statements for Fifth Amendment Violation (#24) should be denied.

DATED this 12th day of January, 2010.

_____
**LAWRENCE R. LEAVITT**
**UNITED STATES MAGISTRATE JUDGE**